# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE: ZOFRAN (ONDANSETRON) PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL No. 1:15-md-2657-FDS |
| This Document Relates to: | ) ) |  |
| THOMAS BROWN, et al., v. GLAXOSMITHKLINE LLC, 1:19-cv-10647-FDS | ) ) ) ) |  |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO REMAND

**SAYLOR, J.**

This case is part of a multi-district litigation proceeding arising out of claims that the use of the drug Zofran (ondansetron) by pregnant women caused birth defects. Plaintiffs Thomas Brown and Maria Del Carmen Espindola Gomez originally filed suit in Oregon state court against defendants GlaxoSmithKline, LLC ("GSK") and Providence Health System-Oregon d/b/a Providence Newberg Medical Center f/k/a Providence Newberg Hospital ("Providence") alleging that Espindola Gomez's use of Zofran during pregnancy caused congenital heart defects in her child.

This case is before the Court for a second time, having been removed, transferred to this MDL proceeding, and then remanded three years ago. *See Brown, et al. v. GlaxoSmithKline, LLC, et al.*, 16-cv-10215-FDS. Upon remand, and after two more years of litigation in Oregon state court, the claims against Providence were dismissed following a successful motion for summary judgment. That prompted GSK to remove the case to federal court for a second time. Plaintiffs have again moved to remand, contending that the removal was untimely and barred by the "voluntary-involuntary" doctrine. With plaintiffs' motion to remand pending, the Judicial

Panel for Multidistrict Litigation ("MDL Panel") once again transferred the case to this district.

For the following reasons, and having considered the issue with the benefit of the state court's summary-judgment record, plaintiffs' motion to remand will be granted.

I.  **Background**

Defendant GSK distributed and sold the drug ondansetron under the brand name Zofran. Zofran was first approved in 1991 for the prevention of post-operative nausea and vomiting associated with anesthesia and for nausea and vomiting caused by radiotherapy and chemotherapy. In addition to those approved uses, GSK is alleged to have marketed Zofran "off-label" for pregnancy-related nausea and vomiting, commonly known as "morning sickness." Plaintiffs in this multidistrict litigation allege that Zofran was in fact unsafe for use in pregnant women, and that *in utero* exposure to Zofran caused birth defects in children born to mothers who took the drug. This particular action involves the claims of two plaintiffs: Thomas Brown and Maria Del Carmen Espindola Gomez, who are the parents of M.B. Plaintiffs sued both GSK, the manufacturer of Zofran, and Providence, a hospital located in Oregon that dispensed Zofran to Espindola Gomez.

On August 28, 2015, plaintiffs filed a complaint in Oregon state court. The complaint named GSK and Providence as defendants, and alleged seven counts arising out of congenital heart defects suffered by M.B. and allegedly caused by Espindola Gomez's use of name-brand Zofran during pregnancy. Three of those claims were brought against Providence: strict liability (Count Three); negligent misrepresentation (Count Five); and loss of consortium (Count Seven).

In October 2015, GSK removed the action to the United States District Court for the District of Oregon based on a facial challenge to the complaint, contending that Providence's citizenship should be ignored for diversity jurisdiction purposes because it was fraudulently joined. Plaintiffs moved to remand the case for lack of subject-matter jurisdiction due to a lack

2

of complete diversity of citizenship among the parties. On January 5, 2016, the district court stayed the case pending its transfer to this district by the MDL Panel for consolidation pursuant to 28 U.S.C. § 1407.

The case was transferred by the MDL Panel to this district in February 2016. On April 21, 2016, plaintiffs renewed their motion to remand. GSK opposed remand on the ground that complete diversity existed based on the doctrine of fraudulent joinder.

The Court granted the motion to remand on June 16, 2016. It observed that under Oregon law, strict liability may attach to a "seller" of a product in a defective condition, unreasonably dangerous to the user or consumer, if the seller "is engaged in the business of selling" such a product. Or. Rev. Stat. Ann. § 30.920(1). At the time, the Oregon Supreme Court had not decided the issue of whether a healthcare provider such as a hospital may be held liable on a strict-liability claim as a "seller" of a prescription drug. However, at least two federal courts in the District of Oregon had held that such a products-liability claim against a healthcare provider may, in fact, be viable under Oregon law. Thus, and in the absence of any controlling Oregon authority, the Court concluded that there was at least a "reasonable possibility" that the Oregon Supreme Court would recognize a strict-liability claim against a healthcare provider that dispensed a pharmaceutical product. *See Universal Truck & Equip. Co. v. Southworth-Milton, Inc.*, 765 F.3d 103, 108 (1st Cir. 2014). The Court also concluded that the allegations in the complaint, although sparse, appeared sufficient to meet the statutory requirement that Providence was in the "business of selling" Zofran as required by the statute.

The parties then litigated the case for two more years in Oregon state court. Plaintiffs' claims against Providence survived a motion to dismiss in December 2016, and the parties proceeded to discovery. At the close of discovery, Providence moved for summary judgment on

3

the two remaining claims against it: strict liability and negligent misrepresentation.[1]

As to the strict-liability claim, Providence contended that plaintiffs had no basis for their claims that the hospital "sold" Zofran to Espindola Gomez. It supported that contention with, among other things, the following undisputed facts:

- "[Providence] had an inpatient pharmacy located within the hospital facility which stocked a wide range of pharmaceuticals for administration to a patient upon the order of a physician on its medical staff." (Providence's Mot. for Partial Summary Judgment at 9).

- "[Providence] dispensed pharmaceuticals as part of its provision of medical services to patients at the hospital only and was not in the business of selling Zofran injectable or other medications to the public." (*Id.*).

- "[Providence] [did not] market or advertise Zofran injectable or any other medications for sale." (*Id.*).

- "[Providence] was prohibited by state and federal law from selling medications to patients after discharge from the hospital." (*Id.*).

- "A person such as plaintiff [Espindola] Gomez could not just come in to [Providence] and purchase Zofran injectable." (*Id.*).

Plaintiffs opposed the motion as to the strict-liability claim, contending that "Providence was engaged in the business of selling Zofran and that defendant sold, distributed, vended, administered and/or supplied the Zofran which caused the injuries at issue in this case." (Pls.' Resp. at 7). They supported that contention with, among other things, the following undisputed facts:

- "[Providence's] in-house pharmacy vended [Zofran]." (*Id.* at 2).

- "[Providence] billed both Ms. Espindola Gomez's insurer and Ms. Espindola Gomez herself for the drug." (*Id.* at 3).

- "Ms. Espindola Gomez signed a document . . . entitled, 'Condiciones de Servicio' ('Conditions of Service'),"  wherein she "agree[d] to pay for the services *or products* provided by Providence Health System." (*Id.*) (emphasis

---

[1] The claim against Providence for loss of consortium appears to have been dismissed at some time prior to summary judgment.

added).  That agreement specified that "Providence Health System includes hospitals, clinics, ambulatory services, home and community services, *retail pharmacies* and convalescent centers."  (*Id.* at 4) (emphasis added).

Plaintiffs voluntarily dismissed their negligent-misrepresentation claim during oral argument on October 29, 2018.[2]  Ruling from the bench on the strict-liability claim, Judge Silver concluded that "in this particular case, under these facts," Providence was not in the business of selling Zofran.  Judge Silver specifically observed:

> . . . I can't find, under the specific facts of this case, that the hospital was engaged in the business of selling Zofran.  There certainly could be scenarios in which a hospital could be found to be engaged in the business of selling a particular drug.  But under the facts of this case, . . . I don't believe that the . . . intent of the legislature or the language of the statute is to hold the hospital liable in strict products liability.
>
> The plaintiff came to the hospital for services.  She didn't come to the hospital to buy a drug, or to do anything specific.  She didn't know what was going to happen when she got there. . . .
>
> . . . [P]erhaps the critical fact in this case is that the license of the hospital—and the legislature's set up the statutory licensing scheme for what hospitals can do, and what the pharmacies within those hospitals can do.  And I'm not even sure if pharmacy is the right word to use in this case.  I think institutional drug outlet, . . . is the term used in the statute.  That license that this hospital had does not allow it to sell a drug to anyone, or even fill a prescription from a doctor to give to a patient to take away.
>
> . . . But in this case all the hospital was allowed to do, under their license that was granted to them by the State of Oregon, was [to] have a place where drugs were stored, so a doctor there at the hospital, if they needed that drug in providing a service to the patient for which the patient came to the hospital, that's where they could go to get it.  And then it could be administered as part of the course of treatment.  But it couldn't be sold to consumers.
>
> \*     \*     \*
>
> . . . I think that [the hospital] institutional drug outlet license restricted them in terms of what they could do.  And so in these cases, any of the drugs that they had on the hospital grounds as part of that license, because of the way that they could

---

[2] GSK contends that plaintiffs "abandoned" their negligent-misrepresentation claim without "even bothering to defend it in open court," after having "failed to identify any evidence that Providence misrepresented Zofran safety information."  (GSK's Opp. to Pls.' Mot. to Remand at 1, 14).  Plaintiffs reply that their withdrawal of the negligent-misrepresentation claim before the summary judgment hearing was a "strategic[]" decision made in "good faith."  (Pls.' Reply at 4-5).

5

> be used, I think that takes the hospital out of any definition of being engaged in the business of selling that particular drug.
>
> \* \* \*
>
> And I do not believe that, under the facts of this case, under any definition of, engaged in the business of selling, that the hospital met that definition. And so that's why I am granting the hospital's motion for summary judgment on the issue of strict product liability.

(Oct. 29, 2018 Tr. at 83-87). Following the that ruling, plaintiffs' counsel stated on the record that an appeal of the ruling "might not be needed . . . depending on the outcome of what happens with GSK." (*Id.* at 89).[3]

On November 27, 2018, the Oregon trial court entered an order granting Providence's motion for summary judgment on the strict-liability claim—the only remaining claim against it—and entered a limited judgment dismissing plaintiffs' claims against Providence with prejudice. That same day, GSK removed the action to the United States District Court for the District of Oregon for a second time.[4] Plaintiffs again moved to remand under 28 U.S.C. § 1447. With that motion pending, the MDL panel transferred the case to this district for a second time.

Meanwhile, on December 4, 2018, plaintiffs filed a notice of appeal with the Oregon circuit court—that is, an appeal of the limited judgment dismissing the claims against Providence. Providence then moved to dismiss the appeal on the grounds that GSK's removal of the case to federal court deprived the circuit court of jurisdiction. On February 7, 2019, the circuit court issued an order denying Providence's motion to dismiss, but holding plaintiffs' appeal in abeyance pending the federal court's disposition of the notice of removal.

---

[3] GSK contends that this statement was "tantamount to an admission that Plaintiffs had no real interest in pursuing a judgment against Providence because they intended to seek full relief from GSK alone." (GSK's Opp. to Pls.' Mot. to Remand at 14).

[4] On November 29, 2018, recognizing that the state court had dismissed all claims against Providence, the district court dismissed Providence from the federal action.

6

## II. Legal Standard

### A. Removal and Remand

Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." By statute, this Court has subject-matter jurisdiction over, among other things, all civil actions where the amount in controversy exceeds $75,000 and where there is diversity of citizenship. *See* 28 U.S.C. § 1332(a). "This statutory grant requires *complete* diversity between the plaintiffs and defendants in an action." *Picciotto v. Continental Cas. Co.*, 512 F.3d 9, 17 (1st Cir. 2008) (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806); *Halleran v. Hoffman*, 966 F.2d 45, 47 (1st Cir. 1992)).

A notice of removal must be filed "within 30 days after the receipt by the defendant . . . of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based," 28 U.S.C. § 1446(b)(1), or "within 30 days after receipt by the defendant . . . of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." *Id.* § 1446(b)(3). However, "[a] case may not be removed . . . on the basis of [diversity jurisdiction] . . . more than 1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." *Id.* § 1446(c)(1). Federal courts have defined bad faith under § 1446(c)(1) as engaging in intentional conduct— action or inaction—to defeat removal. *See Comer v. Schmitt*, 2015 WL 5954589, at *4 (S.D. Ohio Oct. 14, 2015), *rept. and recomm. adopted*, 2015 WL 7076634 (S.D. Ohio Nov. 13, 2015); *Ehrenreich v. Black*, 994 F. Supp. 2d 284, 288-89 (E.D.N.Y. 2014).

A case removed from state court must be remanded "[i]f at any time before final

judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The removing defendant bears the burden of demonstrating the subject-matter jurisdiction of the federal court. *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 4 (1st Cir. 1999). There is a presumption against removal, and any doubts as to the court's jurisdiction must be resolved in favor of remand. *Tremblay v. Phillip Morris, Inc.*, 231 F. Supp. 2d 411, 414 (D.N.H. 2002). "[A]ny legal ambiguities in the controlling state law are resolved in favor of the non-removing party and all contested factual issues and any doubt as to the propriety of the removal must be resolved in favor of remand." *Nordin v. PB&J Resorts, LLC*, 2016 WL 2757696, at *1 (D.N.H. May 12, 2016) (quoting *Burden v. General Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir. 1995); *Renaissance Mktg., Inc. v. Monitronics Int'l, Inc.*, 606 F. Supp. 2d 201, 208 (D.P.R. 2009)) (internal quotations omitted).

### B. Voluntary-Involuntary Doctrine

One limitation on removal is the so-called "voluntary-involuntary" doctrine, which provides that "when a case is not removable at the time it is filed, but becomes facially removable at a later date because of the dismissal of a non-diverse defendant, removal is authorized only if diversity results from a voluntary act of the plaintiff." *Five Star Quality Care, Inc. v. Sunrise Senior Living, Inc.*, 2009 WL 1456303, at *1 (D. Mass. May 22, 2009); *see also Self v. General Motors Corp.*, 588 F.2d 655, 658-59 (9th Cir. 1978).[5] In other words, if the non-diverse defendant "was dismissed from the case by the voluntary act of the plaintiff, the case is

---

[5] The parties dispute whether First or Ninth Circuit precedent controls the issue of remand here. There appears to be no substantive conflict between the circuits as to any of the issues presented in this motion. In any event, because "a transferee court [that] receives a case from the MDL Panel, . . . [is to] appl[y] the law of the circuit in which it is located," the Court will follow First Circuit precedent. *See In re General Am. Life Ins. Co. Sales Practices Litig.*, 391 F.3d 907, 911 (8th Cir. 2004); *see also In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1174 (D.C. Cir. 1987); *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.*, 76 F. Supp. 3d 321, 327 n.4 (D. Mass. 2015) ("[Q]uestions of law in MDL-transferred cases are governed by the law of the transferee court.").

removable, but if not, then the case is not removable because the dismissal is still subject to review on appeal." *Sparrock v. Hartford Life & Acc. Ins. Co.*, 2015 WL 13298388, at *2 (D. Mass. Mar. 27, 2015), *rept. and recomm. adopted*, 2015 WL 13427502 (D. Mass. Apr. 24, 2015) (citing *Universal Truck*, 765 F.3d at 108). "The rationale for the [voluntary-involuntary doctrine] is that although a defendant should not be allowed to change his circumstances after the complaint is filed for the sole purpose of effectuating removal, there is no reason to protect the plaintiff against the adverse consequences of the plaintiff's own voluntary acts." *Maine Employers Mut. Ins. Co. v. Yates Ins. Agency*, 52 F. Supp. 2d 135, 136 (D. Me. 1999).

C. **Fraudulent Joinder**

"A party fraudulently joined to defeat removal . . . is disregarded in determining diversity of citizenship." *Nordin*, 2016 WL 2757696, at *2 (quoting *Polyplastics, Inc. v. Transconex, Inc.*, 713 F.2d 875, 877 (1st Cir. 1983)). "In the context of fraudulent joinder, 'fraudulent is a term of art' that applies to the joinder of an in-state defendant against whom plaintiff 'simply has no chance of success, whatever the plaintiff's motives.'" *Longden v. Philip Morris, Inc.*, 2003 WL 21975365, at *3 (D.N.H. Aug. 19, 2003) (quoting *Hardy v. Ajax Magnathermic Corp.*, 122 F. Supp. 2d 757, 759 (W.D. Ky. 2000)). Thus, "removal is not defeated by the joinder of a non-diverse defendant where there is no reasonable possibility that the state's highest court would find that the complaint states a cause of action upon which relief may be granted against the non-diverse defendant." *Universal Truck*, 765 F.3d at 108; *see also Five Star Quality Care*, 2009 WL 1456303, at *1 n.2 ("Fraudulent joinder occurs when a defendant against whom a plaintiff has no conceivable claim is named as a party to a lawsuit solely for the purpose of defeating

federal jurisdiction.").[6]

"Where the defendants have raised fraudulent joinder as the basis for diversity jurisdiction, that burden is a heavy one." *Nordin*, 2016 WL 2757696, at *1 (citing *Rosbeck v. Corin Grp., PLC*, 140 F. Supp. 3d 197, 203 (D. Mass. 2015)). The removing party must show "that there is no reasonable possibility of a cause of action through clear and convincing evidence." *Id.* at *3. The analysis is "not dissimilar" to a Rule 12(b)(6) analysis. *Id.*; *see also Longden*, 2003 WL 21975365, at *3 ("[J]oinder [is] not fraudulent if [a] case can withstand a 12(b)(6) motion directed to [the] sufficiency of the cause of action.") (alteration in original) (quoting *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1319 (9th Cir. 1998)). To decide the question of fraudulent joinder, the court "may consider additional evidence beyond the claims made in the pleadings, including affidavits of the parties." *See Nordin*, 2016 WL 2757696, at *3 (quoting *Phillips v. Medtronic, Inc.*, 754 F. Supp. 2d 211, 215 (D. Mass. 2010)); *see also Badon v. RJR Nabisco Inc.*, 236 F.3d 282, 284-85 & n.3 (5th Cir. 2000) (considering "undisputed summary judgment type evidence" for claim of fraudulent joinder).

### III. Analysis

Plaintiffs contend that removal was improper, and the case should be remanded, for two reasons. First, they contend that removal violated the voluntary-involuntary doctrine, because GSK filed its notice of removal after the entry of a state-court order granting a contested motion for summary judgment and entering a limited judgment eliminating the non-diverse defendant—an order that plaintiffs have appealed in the state court system. In other words, they contend that removal is barred because the dismissal of Providence was not the result of a voluntary step by

---

[6] Fraudulent joinder may also be established by a showing "that there has been outright fraud committed in the plaintiff's pleadings." *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.*, 111 F. Supp. 3d 79, 83 n.4 (D. Mass. 2015) (quoting *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 207 (2d Cir. 2001)). GSK does not contend that plaintiffs have committed such a fraud here.

plaintiffs. Second, they contend that GSK's notice of removal was untimely because it was filed more than three years after the original complaint, and outside the one-year deadline set forth in 28 U.S.C. § 1446(c)(1).

GSK counters that removal is not barred by the voluntary-involuntary doctrine because plaintiffs voluntarily dismissed their negligent-misrepresentation claim against Providence, and, in any event, the equitable exception of fraudulent joinder applies because plaintiffs fraudulently joined Providence in order to destroy complete diversity and defeat removal. In addition, GSK contends that removal was not untimely because Providence was named as a defendant in bad faith, and therefore the one-year rule does not apply.[7]

Because the Court concludes that removal is barred by the voluntary-involuntary doctrine and the fraudulent-joinder exception does not apply, it will not reach the issue of timeliness.

### A. Voluntary-Involuntary Doctrine

Absent fraudulent joinder, GSK's removal appears to be barred by a straightforward application of the voluntary-involuntary doctrine. Diversity in this case was not created by a voluntary act of plaintiffs. Rather, GSK removed the case only after the Oregon state court granted Providence's contested motion for summary judgment on the strict-liability claim and entered a limited judgment dismissing Providence from the case. *See Maine Employers*, 52 F. Supp. 2d at 138. Moreover, plaintiffs subsequently filed a timely notice of appeal of that order. *See id.* Plaintiffs' voluntary dismissal of one claim (negligent misrepresentation) does not change the result when plaintiffs opposed the summary judgment motion as to their other claim (strict liability).

---

[7] In other words, GSK contends that its notice of removal was filed "as soon as it became obvious that Plaintiffs had no claim against Providence," and therefore would have been timely whenever it was filed. (GSK's Opp. to Pls.' Mot. to Remand at 1-2).

11

Accordingly, unless the fraudulent-joinder exception applies, removal is barred by the voluntary-involuntary doctrine.

### B. Fraudulent Joinder

The complaint asserts a claim for strict liability against Providence as a "seller" of the Zofran taken by Espindola Gomez. GSK contends that Providence was fraudulently joined in the action because Oregon does not recognize a cause of action against healthcare providers for strict liability. As noted, at the time of the Court's 2016 remand, the Oregon Supreme Court had not decided the issue of whether a healthcare provider such as a hospital may be held liable on a strict-liability claim as a "seller" of a prescription drug under Or. Rev. Stat. Ann. § 30.920(1). However, at least two federal courts in the District of Oregon had held that "a products liability claim against a healthcare provider . . . may, in fact, be viable under Oregon law." *See Ryles v. I-Flow Corp.*, 2011 WL 669124, at *2 (D. Or. Feb. 17, 2011) (quoting *Snyder v. Davol, Inc.*, 2008 WL 113902, at *1 (D. Or. Jan. 7, 2008) (citing *Docken v. Ciba-Geigy*, 739 P.2d 591, 594 (1987))). The parties have not provided anything to suggest that the law of Oregon has since changed.

When faced with removal of an action on the basis of alleged fraudulent joinder, courts have an "obligation to 'resolv[e] . . . legal ambiguities in the controlling state law in favor of the non-removing party." *Rosbeck*, 140 F. Supp. 3d at 203 (quoting *Bruden v. General Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir. 1995)). Thus, in the absence of any controlling Oregon authority, the Court concludes, as it did in 2016, that at the time the complaint was filed there was at least a reasonable possibility that the Oregon Supreme Court would recognize a strict-liability claim against a healthcare provider that dispensed a pharmaceutical product.

GSK further contends that even assuming a strict-liability action against Providence is viable under Oregon law, the summary judgment evidence fell short of establishing that

Providence is in the "business of selling" Zofran as required by Or. Rev. Stat. Ann. § 30.920(1)(a). In other words, GSK contends that plaintiffs had no reasonable basis in fact for their claim that Providence sold Zofran to Espindola Gomez, much less that Providence was "in the business of selling" Zofran. The complaint alleged that Espindola Gomez was administered Zofran while being treated at Providence's emergency room, and that Providence sold Zofran to her while she was pregnant with M.B. (Compl. ¶¶ 27, 56). That allegation survived a motion to dismiss. Discovery then revealed at least some evidence that Providence sold her Zofran, including an invoice from Providence for the cost of the drug, and a document plaintiff signed agreeing that she was buying products from Providence.

Under the circumstances—and even though the Oregon judge ultimately concluded that plaintiffs were incorrect in their interpretation of the statute based on contrary evidence—the Court cannot say that plaintiffs had no reasonable basis in fact for their claim that Providence was in the business of selling Zofran, or that there was no reasonable possibility that an Oregon court would render that conclusion.

Finally, GSK argues that plaintiffs made "little effort to prosecute their claims against [Providence]." It specifically points to plaintiffs' failure to depose a single corporate witness;[8] their service of "only token" discovery requests;[9] the fact that plaintiffs' counsel communicated

---

[8] Plaintiffs apparently deposed two health-care providers who worked at Providence—the doctor who proscribed Zofran to Espindola Gomez and the nurse who administered it.

[9] GSK contends that "[t]he single set of written discovery requests Plaintiffs did serve on Providence asked for little information beyond the sort relevant to damages in any personal injury claim, like treatment- and condition-related information." (GSK's Opp. to Pls.' Mot. to Remand at 17).

Plaintiffs respond that they "propounded requests for production to Providence in order to obtain documents related to Providence's communications with and purchases from GSK, documentation and billing records from the hospital which showed that Providence in turn sold Zofran to the Plaintiff, charged the Plaintiff for it, and that it was paid for, and any records which would tend to show that Providence had prior knowledge of the potential of Zofran to harm fetal development." (Pls.' Reply at 5). They further contend that "[the] depositions and the records established the *prima facie* elements necessary to prove that Providence sold the subject drug to the Plaintiff, that it was provided to her without alteration, and that it was administered to her in the facility. That is, the

13

with GSK's counsel without copying Providence's counsel;[10] and plaintiffs' minimal opposition to Providence's motion for summary judgment, including the voluntary oral dismissal of their negligent-misrepresentation claim. (GSK's Opp. to Pls.' Mot. to Remand at 1).

Plaintiffs' litigation efforts against Providence certainly do not inspire confidence that they intended to prosecute their claims vigorously, and there is ample reason to suspect that the hospital was joined simply in order to defeat diversity jurisdiction. Nonetheless, under the applicable legal framework, the evidence is not sufficient to find that joinder was fraudulent and that therefore the non-diverse defendant may be disregarded. *Cf. In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 2014 WL 2011597, at *3 (E.D. Pa. May 15, 2014) (finding that the plaintiffs "lack[ed] [a] genuine intent to proceed with claims against [the non-diverse defendant]" and therefore disregarding the non-diverse defendant for purposes of determining whether the court had jurisdiction).[11]

Accordingly, the fraudulent-joinder exception does not apply, and removal is barred by the voluntary-involuntary doctrine.

### C. Rule 21 Severance

In the alternative, GSK contends that even if federal jurisdiction did not properly exist when it removed the case, the Oregon district court's dismissal of Providence cured any jurisdictional issue, and a federal court therefore has jurisdiction to try the case and enter a valid

---

discovery was properly aimed to prove the elements of strict product liability against Providence. Put another way, no further discovery was undertaken because none was necessary." (*Id.*).

[10] GSK contends that plaintiffs "routinely" omitted counsel from "scheduling" e-mail communications with GSK. GSK does not, however, provide any further information about those e-mails.

[11] In *Avandia*, the plaintiffs, without explanation, did not serve a single discovery request or seek any recovery from the non-diverse defendant over the course of five years of litigation in state court, despite the fact that discovery against the diverse defendant had long since been completed. *See id.* at *3. The discovery requests that were served on the non-diverse defendant happened only after the court provided notice of a hearing on the issue of fraudulent joinder. Moreover, the court found that the discovery sought in those requests "[would] not generate any information about the Avandia distribution process"—information the plaintiffs would need to survive a motion for summary judgment by the non-diverse defendant. *See id.*

14

judgment. *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 73 (1996). Had the Oregon district court not dismissed Providence, GSK further contends, the court could have severed the claims against Providence under Fed. R. Civ. P. 21, because plaintiffs can achieve complete relief in its absence, as evidenced by its counsel's statement that an appeal of the Oregon state court's summary judgment ruling "might not be needed . . . depending on the outcome of what happens with GSK." (Oct. 29, 2018 Tr. at 89). GSK characterizes that statement as an admission of plaintiffs' intent to proceed only against GSK, and contends that Providence is therefore a dispensable party, the claims against which can be severed under Rule 21.

Rule 21 provides that "[m]isjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21. "In addition, '[a] court may declare a misjoinder of parties because no relief is demanded from one or more of the parties joined as defendants.'" *See Varsity Wireless Inv'rs, LLC v. Town of Hamilton*, 370 F. Supp. 3d 292, 297 (D. Mass. 2019) (quoting 7 Fed. Prac. & Proc. Civ. § 1683). "[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989). "The decision to dismiss a non-diverse party is within discretion of the court, but this authority should be exercised 'sparingly.'" *Quincy Mut. Fire Ins. Co. v. Vivint Solar Developer, LLC*, 2018 WL 3974820, at *4 (D. Mass. Aug. 20, 2018) (quoting *Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 677 (1st Cir. 1994)). "The decision to dismiss 'revolves largely around whether the non-diverse litigant is a dispensable or indispensable party.'" *Carden v. Klucznik*, 775 F. Supp. 2d 247, 251 (D. Mass. 2011) (quoting *American Fiber & Finishing Inc. v. Tyco Healthcare Grp., LP*, 362 F.3d 136, 142 (1st Cir. 2004)). At least one court in this district has held that it is improper for a Court to apply Rule 21 to drop a party where "the lack of complete

diversity was apparent at the time of removal and where defendants have failed to show fraudulent joinder." *See Quincy*, 2018 WL 3974820, at *4 .

Under the circumstances, applying Rule 21 would "allow[] [GSK] to succeed in retaining federal jurisdiction over the case despite not being able to meet the heavy burden of proving fraudulent joinder." *See id.* at *5. Accordingly, the Court declines to exercise its discretion to sever the claims against Providence.[12]

## IV. Conclusion

For the foregoing reasons, plaintiffs' motion to remand is GRANTED.

**So Ordered.**

                           /s/ F. Dennis Saylor
                           F. Dennis Saylor IV

Dated: June 13, 2019               United States District Judge

---

[12] In any event, because plaintiffs' motion to remand is granted, the Court lacks subject-matter jurisdiction to decide the Rule 21 issue, rendering GSK's request for severance moot. *See id.* at *5 n.6.